[Civ. No. 33586. Second Dist., Div. Five. Apr. 10, 1970.]

RODOLFO SALTARES, as Administrator, etc., Plaintiff and Appellant, v. BALDO M. KRISTOVICH, Individually and as Public Administrator, etc., Defendant and Respondent.

**COUNSEL**

Morgan D. Goldie for Plaintiff and Appellant.

John D. Maharg, County Counsel, John F. Keating and Edward G. Pozorski, Deputy County Counsel, for Defendant and Respondent.

**OPINION**

AISO, J.—Plaintiff Rodolfo Saltares, administrator of the estáte of Anibal Saltares, deceased, (hereafter "plaintiff") appeals from a judgment of dismissal entered upon an order sustaining without leave to amend the general demurrer of defendant, Baldo M. Kristovich, public administrator, as

the administrator of the estate of Carmen Saltares, deceased, (hereafter "defendant" in the singular form)[1] interposed to plaintiff's "Second Amended Complaint for Money Damages."[2] We have concluded that the judgment should be affirmed.

### The Demurrer

The gravamen of defendant's demurrer is that the second amended complaint fails to state a cause of action against him as the public administrator of the estate of Carmen Saltares, deceased, or as the public administrator of Los Angeles County, or as an individual, because the pleadings disclose that all of the acts and omissions of which plaintiff complains are discretionary acts or omissions on his part as the public administrator of the estate of Carmen Saltares, deceased, and because as such government employee he was immune from liability for the results of his discretion exercised within the scope of his duties. (Gov. Code, § 820.2.)

### The Pleadings

The second amended complaint purports to allege a cause of action against defendant, Baldo M. Kristovich as the public administrator for the County of Los Angeles, and Baldo M. Kristovich as an individual. It then, in substance, alleges the following:

"[O]n December 19th, 1966, Anibal Saltares and his wife, Carmen Saltares, died of gun shot wounds, Carmen Saltares expiring at 11:30 AM and Anibal Saltares expiring at 2:15 PM on said date."

On that date, Anibal Saltares (hereafter "Anibal") and Carmen Saltares (hereafter "Carmen") held two parcels of improved real property in joint tenancy. For convenience they are designated as the Monroe property and the Madison property.[3] The Monroe property was encumbered with a first

---

[1] The plural form "defendants" shall be used to denote all three capacities which plaintiff purports to sue: (1) Kristovich, public administrator of the County of Los Angeles; (2) Kristovich, public administrator of the estate of Carmen Saltares, deceased; and (3) Kristovich as an individual. This should not be construed as indicating that we necessarily recognize the separate classifications, especially between (1) and (2), as it appears unnecessary to do so for a disposition of this appeal.

[2] The alleged cause of action which is the subject of this appeal was originally the first count of a three-count complaint. The demurrer was sustained to this one count only. Plaintiff voluntarily dismissed his second and third counts and thereafter obtained an order of dismissal of this remaining count. An amended judgment of dismissal, filed April 3, 1970, by the superior court and which dismisses the action against Kristovich in all three capacities, was lodged with this court subsequent to oral argument.

[3] Descriptions as pleaded: "255 Monroe Street, Long Beach, California, legally described as Lots 73 and 74, Tract 6720, Recorded in Book 71 at Page 79" and "2624 Madison Street, Long Beach, California, legally described as Lots 251 and 252, Tract 6720, Recorded in Book 71 at Page 79."

trust deed securing an indebtedness of $14,799.38 to the Pacific Savings and Loan Association of Downey, California, and a second trust deed securing an indebtedness of $651 to Archie and Audrey Ciemny of Long Beach. "The monthly payments on the First Trust Deed were $99.00 per month, and the monthly payments on the Second Trust Deed were $15.00 per month." The Madison property was encumbered with a trust deed securing an indebtedness of $9,792 to Trans World Savings and Loan Association of Lynwood, California. The monthly payments on this obligation were $70 per month. Monthly payments on all three obligations secured by the trust deeds were current as of December 19, 1966, when Anibal and Carmen died.

Anibal died intestate leaving his parents as heirs, and plaintiff as the duly appointed and acting administrator of his estate (Estate of Anibal Saltares, Deceased, Los Angeles Superior Court No. SOP 11013) "had [the] right to the premises of the herein described real property with right of control and management" thereof as part of Anibal's estate.

Defendant listed an undivided one-half interest in the real properties as an asset of Carmen's estate to which he had been appointed the administrator (Estate of Carmen Saltares, Deceased, Los Angeles Superior Court No. P 517335). "[A]t the time of the demise of Anibal Saltares, defendants, and each of them" through an agent contacted the tenants of the real properties and "demanded that the tenants make all rental payments to said defendant, Baldo M. Kristovich, Public Administrator for the County of Los Angeles, and administrator of the Estate of Carmen Saltares." "[D]efendants, and each of them, acted wrongfully and tortiously in contacting said tenants and collecting by demand, rental payments for said property."

Defendants, starting with the rental payments due for January 1967, collected $135 per month from the Monroe property and $100 per month from the Madison property despite plaintiff's demand on February 9, 1967, to desist from collection of rentals and for an accounting thereof. From the collection of these rentals, defendants had ample funds to pay the payments due on the indebtednesses secured by the trust deeds, but "except for the payment of $297.00 paid May 22nd, 1967, on the Monroe . . . property; and the sum of $210.00 paid March 10th, 1967, on the Madison . . . property" they failed to make such payments, causing "the beneficiaries of the trust deed notes [to threaten] foreclosure sales of the properties. . . ."

On May 1, 1967, plaintiff filed a petition for instructions in Estate of Anibal Saltares (Los Angeles Superior Court No. SOP 11013) requesting an order permitting plaintiff to expend funds from said estate to bring the payments on the "trust deed notes" up to date and to restrain defendants from interfering with plaintiff's collection of rentals. Defendants, however,

interposed objections and *the petition was denied by the court.* Plaintiff had no other funds except the rental payments collected by defendants from which to prevent "foreclosure" of the real properties.

The "Monroe . . . property was sold at a foreclosure sale on or about July 10, 1967; and . . . the Madison . . . property was sold at a foreclosure sale on or about September, 1967."

Defendants had collected a total of $1,357 as rental payments between the date of Anibal's death (December 19, 1966) and the "date of foreclosure sales."

"[T]he wrongful, wilful and malicious misconduct of the defendants, in failure by intention, to apply rental payments to the trust deed notes, after wrongfully collecting said rental payments, is the direct cause of the foreclosure sales, and the loss of the real properties to the Estate of Anibal Saltares."

The reasonable market value of the Monroe property was $19,500 and the equity therein $5,049.62; the market value of the Madison property was $14,500 and the equity therein $4,708; thus the estate of Anibal Saltares has suffered loss in the amount of $9,757.62.

Plaintiff filed a claim with the Clerk of the Board of Supervisors of Los Angeles County on September 6, 1967, but the Board of Supervisors did not act upon the claim within 45 days from September 6, 1967, the date upon which it acknowledged its receipt.

### Facts Judicially Noticed

A demurrer reaches not only the contents of the pleading itself, but also such matters as may be considered under the doctrine of judicial notice. (*Weil* v. *Barthel* (1955) 45 Cal.2d 835, 837 [291 P.2d 30]; *Agostini* v. *Strycula* (1965) 231 Cal.App.2d 804, 806 [42 Cal.Rptr. 314].) The complaint is to be read as if it contains all matters of which the court can take judicial notice even in the face of allegations to the contrary. (*Chavez* v. *Times-Mirror Co.* (1921) 185 Cal. 20, 23 [195 P. 666]; *Loranger* v. *Nadeau* (1932) 215 Cal. 362, 365 [10 P.2d 63, 84 A.L.R. 1264] [overruled on another ground in *Reich* v. *Purcell* (1967) 67 Cal.2d 551, 555 (63 Cal.Rptr. 31, 432 P.2d 727)]; *Wilson* v. *Loew's Inc.* (1956) 142 Cal. App.2d 183, 187-188 [298 P.2d 152], writ of certiorari dismissed 355 U.S. 597 [2 L.Ed.2d 519, 78 S.Ct. 526].) "[A] complaint otherwise good on its face is nevertheless subject to demurrer when facts judicially noticed render it defective" (*Watson* v. *Los Altos School Dist.* (1957) 149 Cal. App.2d 768, 771 [308 P.2d 872]). (Accord: *Chas. L. Harney, Inc.* v. *State* (1963) 217 Cal.App.2d 77, 86-87 [31 Cal.Rptr. 524]; *Arthur* v.

*Oceanside-Carlsbad Jr. College Dist.* (1963) 216 Cal.App.2d 656, 661 [31 Cal.Rptr. 177].)

■ A court may judicially notice documents in the file of the case wherein the demurrer is interposed (*Dwan* v. *Dixon* (1963) 216 Cal. App.2d 260, 265 [30 Cal.Rptr. 749]), its own records (*Nulaid Farmers Assn.* v. *LaTorre* (1967) 252 Cal.App.2d 788, 791 [60 Cal.Rptr. 821]), as well as the files of another case pending in the court (Evid. Code, § 452, subd. (d); *Flores* v. *Arroyo* (1961) 56 Cal.2d 492, 497 [15 Cal.Rptr. 87, 364 P.2d 263]; *Artucovich* v. *Arizmendiz* (1967) 256 Cal.App.2d 130, 133-134 [63 Cal.Rptr. 810]). These matters are likewise to be judicially noticed by a reviewing court. (Evid. Code, § 459, subd. (a).)

■ In drafting amended pleadings, "[a] pleader may not attempt to breathe life into a complaint by omitting relevant facts which made his previous complaint defective." (*Hills Transp. Co.* v. *Southwest Forest Industries, Inc.* (1968) 266 Cal.App.2d 702, 713 [72 Cal.Rptr. 441]; accord *Lee* v. *Hensley* (1951) 103 Cal.App.2d 697, 709 [230 P.2d 159], and cases cited; and see 2 Chadbourn et al., Cal. Pleading (1961) § 1167, p. 393.)

In his superseded verified first amended complaint, plaintiff pleaded the file in Rodolfo Saltares, Administrator, etc. v. Baldo M. Kristovich, Public Adminstrator, etc. (Los Angeles Superior Court No. SOC 15427) by way of incorporation by reference. Perusal of this file discloses that the present action is but a continuation of that earlier action, which was originally commenced as one for declaratory relief and later sought to be amended into one for money damages. A demurrer to plaintiff's second amended complaint therein was sustained and plaintiff thereupon dismissed that action without prejudice. Nevertheless, defendant's cross-complaint which was filed against and answered by plaintiff as the cross-defendant has not been dismissed. The verified cross-complaint for quiet title, constructive trust, and wrongful death alleges in part: "[O]n or about December 19, 1966, Anibal Saltares intentionally, willfully, maliciously and wrongfully shot the decedent [Carmen] several times with a gun, which resulted in her death. [¶] That as a result of this homicidal killing of the decedent [Carmen] by Anibal Saltares, the properties [which are the subject of the instant action] are now an asset of the estate of Carmen Saltares and are subject to administration in said estate proceeding."[4]

---

[4]In the inventory and appraisement filed by plaintiff in Estate of Anibal Saltares, Deceased (Los Angeles Superior Court No. SOP 11013), there is typewritten in the same type as that which sets forth his address and lists the assets in that estate the following: "On December 19, 1966, Anibal Saltares shot his son, his two daughters, his wife and then committed sucide [*sic*]. He died last but it would seem proper to dis-

Plaintiff also in his verified first amended complaint pleaded defendant's semi-annual report (for the term January 1, 1967, and ending June 30, 1967) rendered pursuant to section 1153 of the Probate Code by express averment and by incorporating by way of reference the file in Estate of Carmen Saltares, Deceased (Los Angeles Superior Court No. P 517335). The report discloses the following financial condition of Carmen's estate: approximate value: $8,527; money received: $1,357; administrator's fees and expenses paid: $910; balance in cash remaining: $447; and balance of property remaining: $7,170. The appraisement on file in that proceeding shows that as of the date of Carmen's death, the amount of indebtedness secured by the first trust deed on the Monroe property was $15,000 with the unpaid principal amount being $14,799.38, and the amount of the indebtedness secured by the second trust deed $850 with the unpaid principal balance being $628.72. The indebtedness secured by the trust deed on the Madison property was $10,200, with the unpaid principal balance being $9,792.22. The file discloses that Carmen's surviving next of kin were apparently her parents, Marcelino Perez and Aurelia Perez, residing in Brooklyn, New York.

The first amended complaint and the inventory and appraisement filed in Estate of Anibal Saltares, Deceased (Los Angeles Superior Court No. SOP 11013) disclose the proper monthly rentals on the Madison property to have been $80 per month rather than $100 per month.

The papers in file No. SOP 11013 also reflect that defendant opposed plaintiff's petition for instructions in that probate proceeding for permission to bring the mortgage payments up to date out of money in that estate and to restrain defendant from further collection of rentals upon the twofold grounds: (1) the proceeds of insurance which plaintiff proposed to utilize to make payments on the mortgages belonged to Carmen's estate, and (2) the probate court lacked general equity jurisdiction in that proceeding to direct defendant to pay the notes in default.

### Public Administrator Acted as Public Employee

Section 820.2 of the Government Code upon which defendant relies provides: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."

We first inquire whether the public administrator in committing the acts

---

tribute any assets under Probate Code Section 228." To the court's inquiry at oral argument as to whether he prepared this statement, plaintiff's counsel replied that he could not recall.

or making the omissions as the administrator of Carmen's estate, of which plaintiff complains, was a public employee within the meaning of section 820.2. A public administrator is an officer of the county. (Gov. Code, § 24000.) In Los Angeles County, he is on a fixed salary. (Charter of Los Angeles County, art. IV, § 14; Los Angeles County Ordinance No. 6222; see *Estate of Miller* (1936) 5 Cal.2d 588, 594 [55 P.2d 491].) Section 811.4 of the Government Code defines a "public employee" as meaning "an employee of a public entity."

■ "The appointment of the Public Administrator [as administrator of an estate] is governed by different rules than those applicable to a private administrator and the former is entitled to appointment, if at all, only by virtue of his office."[5] (*Estate of Miller, supra.*) Possible doubt as to the public administrator's status as a public officer is engendered from some language found in the cases, e.g., "While undoubtedly the public administrator is 'primarily a public officer performing essentially a governmental function' [citation], he also acts in another capacity. When by virtue of his office, he is appointed the administrator of a particular estate, he becomes as to that estate the trustee of a private trust. . . . It is true that his powers and duties, because of his official character, differ in several respects from those of other persons who may be appointed administrators. [Citations.] But where there is no statutory or charter provision specifically governing the public administrator in the discharge of his duties, then he has such powers and duties as would apply to administrators generally. (Prob. Code, § 1142.)" (*Estate of McMillin* (1956) 46 Cal.2d 121, 129 [292 P.2d 881, 56 A.L.R.2d 1175].)

In *Whelan* v. *Bailey* (1934) 1 Cal.App.2d 334, at page 337 [36 P.2d 709], the court said: "While the public administrator has a certain public function . . . , in the performance of his duties he exercises what is essentially a private function, in that he is the personal representative of the deceased, handling the estate for the benefit of the heirs. He obtains his right to so act not by virtue of his office, but by grant of power from the court. . . . After appointment and while acting in the administration of an estate, his functions as the administrator of that particular estate are severable from his status as a public officer, although the two coexist." *Whelan* was overruled by our Supreme Court (*Estate of Miller* (1936) *supra,* 5 Cal.2d 588, 591) which stated: "For reasons hereafter appearing, we are of the opinion that the reasoning of the appellate court in that case is unsound and the decision therein is hereby overruled." Prefacing its enumeration of many distinctions in purpose, functions, and duties between

[5]Propriety of the appointment of the public administrator as the administrator of Carmen's estate is not challenged.

those of a public administrator and those of a private administrator, the court further said at pages 593-594: "[I]t is our opinion that the duties and functions of this officer are primarily governmental in nature. While in many respects the procedure the Public Administrator follows in many probate matters is the same as that followed by a private administrator, and while it is true that many of his duties could be performed by a private administrator, there are many distinctions between the two."

In denying a former public administrator fees for work which he had performed as the administrator of several estates subsequent to the expiration of his term as public administrator, the court stated in *County of Los Angeles* v. *Kellogg* (1905) 146 Cal. 590, 593 [80 P. 861]: "His [public administrator's] official character, in our opinion, is not changed, nor is it taken from him by the imposition of the duties devolved on him by the letters issued to him. He is as much the public administrator when administering an estate . . . as when acting under any other paragraph of section 1726 [of the Code Civ. Proc., now Prob. Code, § 1140]. . . ."[6] The court pointed out that his official bond is in lieu of any administrator's bond upon receiving letters of administration,[7] and that when the public administrator is on a salary all commissions received by him must be paid into the county treasury. (At pp. 595-596.) (See also *Estate of McMillin* (1956) *supra*, 46 Cal.2d 121, 129.) If the funds in an estate turn out to be insufficient to pay all fees and charges incurred for the benefit of the estate by such a salaried public administrator who turns over to the county all his fees and charges allowed to him, then such charges become county charges. (Gov. Code, § 27442.)

*People* v. *Crosby* (1956) 141 Cal.App.2d 172, 175 [296 P.2d 438], held that funds held by a person in his capacity as public administrator constitute public moneys, because he remains "primarily a public officer performing essentially a governmental function" even in the administration of a par-

---

[6]Probate Code section 1140: "The public administrator of each county must take immediate charge of the property within his county of persons who have died, when no executor or administrator has been appointed, and in consequence thereof the property, or any part thereof, is being wasted, uncared for, or lost; and of all estates ordered into his hands by the court. He shall apply for letters of administration upon the estates of decedents who have no known heirs, when the superior court of his county has jurisdiction thereof, and may apply for such letters upon any other estate which he is entitled to administer."

Probate Code section 420 also provides in part: "No person is competent to serve as an administrator or administratrix who is not a bona fide resident of this state. . . ." Therefore, neither of Carmen's parents residing in New York would have been eligible for appointment as the representative of her estate.

[7]Probate Code section 1141 provides in part: "His [public administrator's] official bond and oath are in lieu of the administrator's bond and oath on the grant of special letters of administration, or general letters of administration, or letters of administration with the will annexed; . . . ."

ticular estate and that he therefore could be indicted for misappropriation of public moneys under section 424 of the Penal Code.[8]

In *Crews* v. *Lundquist* (1935) 361 Ill. 193, 197-198 [197 N.E. 768, 770-771], the Supreme Court of Illinois held that when the public administrator administers a deceased person's estate, "he acts as a public officer and his duties concern the state at large or the general public. In so acting he is discharging a function of government." To constitute a public administrator a public officer with such attributes, it explained, was within the power of the Legislature to control and prescribe the descent and distribution of an intestate's estate.

Since the acts and omissions of which plaintiff complains were acts or omissions of the public administrator in his capacity as administrator of Carmen's estate in the course of administration of that estate, we hold that he was a governmental employee or officer, within the meaning of section 820.2 of the Government Code.

### Acts and Omissions were Discretionary

Since section 820.2 of the Government Code requires that the "act or omission" be "the result of the exercise of the discretion" vested in the "public employee," there remains to be considered whether the acts and omissions of which plaintiff complains are within that category.

Although the demarcation between what is discretionary and what is merely ministerial must be decided upon a case-by-case basis in the light of "policy considerations relevant to the purposes of granting immunity" (*Johnson* v. *State of California* (1968) 69 Cal.2d 782, 789 [73 Cal.Rptr. 240, 447 P.2d 352]), the acts and omissions of which plaintiff complains in his second amended complaint were acts resulting from defendant's exercise of discretion as administrator of Carmen's estate when considered in the light of matters judicially noticed and of the applicable rules of law.

It is, of course, the duty of an administrator to marshal the assets of an estate. If the estate includes income-producing real properties, it is the administrator's duty to instruct the tenants as to whom the rentals should be paid. (Cal. Estate Administration (Cont.Ed.Bar 1960) § 8.24, p. 184.)

The pleadings cognizable on demurrer inform us that defendant was in possession of information of sufficient reliability to allege under oath: "That

---

[8]Penal Code section 424 provides in part: "Each officer . . . of any county . . . charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who either: 1. Without authority of law, appropriates the same, or any portion thereof, to his own use, or to the use of another; . . . [i]s punishable by imprisonment in the state prison. . . ."

on or about December 19, 1966, Anibal Saltares intentionally, willfully, maliciously and wrongfully shot [Carmen] several times with a gun. . . . That as a result of the injury so inflicted upon the deceased [Carmen], the decedent died on December 19, 1966." Plaintiff's second amended complaint alleges that Carmen expired at 11:30 a.m. on that date, and that Anibal expired at 2:15 p.m. on the same date.

Although there is a division of authority, the weight of authority,[9] including the more recent cases, statutes,[10] and publications of legal writers, holds that where one joint tenant intentionally and unlawfully causes the death of his joint tenant, the surviving joint tenant immediately becomes a constructive trustee of the entire property for the benefit of the predeceasing joint tenant's heirs or estate, subject to his right to a life interest in one-half of the property. (E.g., *Whitfield* v. *Flaherty* (1964) 228 Cal.App.2d 753, 760-762 [39 Cal.Rptr. 857]; Rest., Restitution, § 188, pp. 773-774; 5 Scott on Trusts (3d ed. 1967) § 493.2, pp. 3520-3521; Bogert, Trusts and Trustees (2d ed. 1960) § 478, pp. 83-87; McGovern, Jr., *Homicide and Succession to Property* (1969) 68 Mich.L.Rev. 65, 86-87; Wade, *Acquisition of Property by Wilfully Killing Another—A Statutory Solution* (1936) 49 Harv.L.Rev. 715, 732-733; Note, 8 Hastings L.J. 330, 332-334 (1957).) The rationale for this view in the words of Professor Scott is: "It would seem that it is not unjust to deprive him [murderer or perpetrator of an unlawful

[9]Most of the cases are collated in *Whitfield* v. *Flaherty* (1964) *infra,* 228 Cal. App.2d 753, 760, fn. 3 [39 Cal.Rptr. 857]; 20 Am.Jur.2d, Cotenancy and Joint Ownership, § 8, p. 99; and 32 A.L.R.2d 1099, at pp. 1107-1108. Two cases not listed in the foregoing collations and which adopt the Scott-Bogert theories as to tenancies by the entirety are: *Hargrove* v. *Taylor* (1964) 236 Ore. 451 [389 P.2d 36] and *Welch* v. *Welch* (Del. Ch. 1969) 252 A.2d 131. In *In re Foster's Estate* (1958) 182 Kan. 315 [320 P.2d 855], the court held that since the surviving joint tenant does not take by inheritance, the code provision precluding one convicted of a felonious killing or procuring such a killing from inheriting from his victim does not apply. A 1935 New York case not mentioned in the *Whitfield* footnote, but holding that the whole of the joint tenancy property goes to the heirs of the predeceased tenant is *Bierbrauer* v. *Moran* (1935) 244 App.Div. 87, 90 [279 N.Y.S. 176, 179]. See also 1960 Ann.Survey of Amer.Law, pp. 453-454.

[10]In Connecticut, the statute provides in part: "with respect to property owned in joint tenancy with rights of survivorship with the deceased, the final adjudication as guilty, either as principal or accessory, of murder in the first or second degree, shall be a severance of the joint tenancy, and shall convert the joint tenancy into a tenancy in common as to the person so adjudged and the deceased but not as to any remaining joint tenant or tenants, such severance being effective as of the time such adjudication of guilty becomes final. . . ." (Public Act 264 (Conn.), 1967.)

In Pennsylvania, the statute reads: "One-half of any property held by the slayer and the decedent as joint tenants, joint owners or joint obligees shall pass upon the death of the decedent to his estate, and the other half shall pass to his estate upon the death of the slayer." (Purdon's Pa. Stats. Ann., title 20, § 3446, subd. (a).)

Similarly worded statutes have been adopted by Rhode Island and Washington. (See 6 Gen. Laws of R.I. (1969 Reenact.) title 33, ch. 1.1, § 33-1.1-6; Rev. Code of Wash. Ann., title 11, ch. 11.84, § 11.84.050, subd. (1).)

intentional homicide] of the whole of the property except a life interest in one half of it. If before severance of their interests the murderer had predeceased his co-owner, he would have taken nothing, although if he had survived him he would have taken everything. It cannot be ascertained whether, but for the murder, he would have predeceased his co-owner and taken nothing. It is fair, therefore, not to limit the constructive trust to one half of the property. The murderer was entitled at least to the enjoyment of one half of the property during his lifetime, and he should not be deprived of this interest. Accordingly, it would seem that he should be chargeable as constructive trustee of the whole of the property, subject to a beneficial interest in himself for life of one half of the property." (Scott, *op.cit. supra*, pp. 3520-3521.)

Here plaintiff's intestate Anibal died within several hours after Carmen's death so we need not trouble ourselves about any income during his lifetime absent a specific showing of his having received any in that brief interim. Some cases and statutes following the suggestion of Professor Wade (*op.cit. supra*) make a further proviso for a "separation, severance, or partition" by the surviving joint tenant during his lifetime. But this facet of the problems raised by the termination of a joint tenancy by a joint tenant's wrongful intentional killing of his cotenant likewise is not an issue under the pleadings we scrutinize here. The basic rule that the surviving malefactor holds the entire estate in trust, subject to his life interest in one-half appears to be the California rule. (*Whitfield* v. *Flaherty* (1964) *supra*.) *Abbey* v. *Lord* (1959) 168 Cal.App.2d 499 [336 P.2d 226], sometimes cited for the proposition that the survivor holds the predeceasing joint tenant's one-half interest in trust, did not actually so hold on its facts or language. It did not reject the possibility of the whole estate being held in trust, subject to the malefactor's life interest in one-half thereof.

Section 258 of the Probate Code does not specifically mention its applicability to a joint tenancy[11] but it is consonant with the provisions of sections 2224 and 3517 of the Civil Code.[12]

---

[11]Probate Code section 258 provides in part: "No person who has unlawfully and intentionally caused the death of a decedent, . . . shall be entitled to succeed to any portion of the estate or to take under any will of the decedent; but the portion thereof to which he would otherwise be entitled to succeed goes to the other persons entitled thereto under the provisions of this chapter or under the will of the decedent . . . ." It is sometimes said that a surviving joint tenant does not take by inheritance and that therefore this section is inapplicable to joint tenancies. (See *Estate of Helwinkel* (1962) 199 Cal.App.2d 283, 287 [18 Cal.Rptr. 473].) However, this view has been criticized. (See, e.g., Bogert, Trusts and Trustees (2d ed. 1960) *supra*, § 478, pp. 84-85.)

[12]Civil Code section 2224: "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, *or other wrongful act,* is, unless he has some

■ If defendant can prove his allegation, then plaintiff had neither "legal" nor beneficial interest to either of the joint tenancy properties. Upon Anibal's demise, the "legal" and beneficial interest to the whole of both properties would have passed to Carmen's administrator and her heirs, subject to administration. (*In re King's Estate* (1952) 261 Wis. 266, 274 [52 N.W.2d 885, 889].) Under such circumstances, defendant was under a legal duty to lay claim to all of the rentals.

Even if we assume *arguendo* that plaintiff was entitled to one-half of the rentals, it would still be incumbent upon him to plead how his receipt of one-half of the rentals would have forestalled the foreclosures.

It is also manifest that defendant did not have sufficient funds from the collection of the rentals to keep up payment of the obligations secured by trust deeds and to pay priority claims against Carmen's estate. The total amount of the mortgage payments falling due during the period in question was $1,104. Plaintiff pleads that the total amount of rentals collected was $1,357. Defendant's statutory report pleaded in a superseded complaint by plaintiff discloses a $910 payment from this amount for administrator's fees and expenses, leaving a cash balance of $447. Plaintiff alleges that defendant did pay on the "trust deed notes" $297 on May 22, 1967, on the Monroe property and $210 on March 10, 1967, on the Madison property, which sums total $507.

Section 27441 of the Government Code provides: "The public administrator shall charge and collect such fees as are allowed by law." Section 950 of the Probate Code lists the "Expenses of administration" as the first to be paid among the decedent's debts and expenses of administration and charges against decedent's estate.

Under the predecessor statutory provisions of section 950, it was held that a mortgagee does not have a preferred claim on rents collected from mortgaged properties lacking specific provision to that effect in the terms of the mortgage itself. (*Estate of McDougald* (1905) 146 Cal. 196, 201-202 [79 P. 875].) ■ Absent special circumstances, whether a mortgage should be paid off is left to the discretion of the representative of the estate. (*In re Stewart's Will* (1938) 169 Misc. 917, 920 [9 N.Y.S.2d 315, 318].) When faced with a foreclosure or a trustee's sale, the administrator must decide "whether to pay the debt or permit the property to be taken." (Cal. Estate Administration (Cont.Ed.Bar 1960) § 10.22, p. 223.) The value of the equity in the property is, of course, an important factor to be con-

---

other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." (Italics added.)

Civil Code section 3517: "No one can take advantage of his own wrong."

sidered in his determination. Absent a showing of bad faith or proof of negligence, the administrator is given considerable leeway in making his decision even vis-à-vis those having an interest in the estate. (*Estate of Armstrong* (1899) 125 Cal. 603 [58 P. 183].) The pleadings have left out mention of any taxes on the real properties that might have become payable during the period in question.

■ Under the circumstances disclosed by the pleadings and the matters judicially noticed, the failure to keep up the payments on the notes secured by the trust deeds upon the "joint tenancy" real properties was the result of an exercise of discretion on the public administrator's part. "Government Code, section 820.2 purports to re-enact the common law discretionary immunity of public employees. The comment of the Legislative Committee inserted in the Senate Journal of April 24, 1963, page 1889 leaves no doubt on that score." (*Ne Casek* v. *City of Los Angeles* (1965) 233 Cal.App.2d 131, 138-139 [43 Cal.Rptr. 294] [footnotes omitted].)

In *Old King Coal Co.* v. *United States* (S.D. Iowa 1949) 88 F.Supp. 124, it was held that the Secretary of Interior was immune from liability under the federal Torts Claim Act when he refused either to operate a coal mine seized under a wartime enabling act or to return the properties to the owners for private operation when he considered it imprudent to operate the mine in face of the then prevailing price for coal.

In *Bank of America* v. *County of Los Angeles* (1969) 270 Cal.App.2d 165 [75 Cal.Rptr. 444], it was held that a deputy county counsel, who appeared at a hearing in a probate court to confirm a probate sale and there announced that the board of supervisors had adopted a resolution to condemn the property up for sale for airport purposes and thereby interfered with the completion of the probate sale, was not liable either in his official capacity or as an individual since his acts were within the exercise of his discretion as a public employee. Cf. also: *Lipman* v. *Brisbane Elementary School Dist.* (1961) 55 Cal.2d 224, 229 [11 Cal.Rptr. 97, 359 P.2d 465].

### Disposition

It is not clear whether the demurrer, sustained by the court without leave to amend, was interposed by defendant in his capacity as administrator of Carmen's estate alone or in all three capacities in which plaintiff purports to sue Baldo M. Kristovich; but we hold no cause of action has been stated against Kristovich in any of the three purported capacities. The (amended) judgment of dismissal filed April 3, 1970, in the superior

court directs a dismissal of the action against Kristovich in all three capacities.

The judgment of dismissal is affirmed.

Stephens, Acting P. J., and Reppy, J., concurred.