Filed 9/2/14  Kenyon v. Applied Technologies CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| MARK KENYON,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>APPLIED TECHNOLOGIES<br>ASSOCIATES, INC.,<br><br>    Defendant and Appellant. | 2d Civil No. B249735<br>(Super. Ct. No. CV128052)<br>(San Luis Obispo County) |

Applied Technologies Associates, Inc. (ATA) hired Mark Kenyon in 1983, with no specific agreement about the length of his employment.  In 1986, Kenyon acknowledged receipt of the company's policy and procedure manual (manual).  The manual stated that the employment relationship between ATA and an employee could be terminated by either party at any time.  In 1992, Kenyon received an updated manual and signed a document which stated, "I understand that employment with the company is not for a specified term and is at the mutual consent of the employee and the Company.  Accordingly, either the employee or the Company can terminate the employment relationship 'at will', with or without cause, at any time."  Here we are asked to decide if the conduct of the company over the ensuing decades gave rise to an implied contract that changed Kenyon's employment status.

ATA appeals from the judgment entered after a jury awarded Kenyon $500,671 in damages for breach of an implied contract that his employment would not be terminated without good cause, and breach of the implied covenant of good faith and fair dealing. ATA contends that, as a matter of law, Kenyon was an at-will employee, that the trial court erred by denying its motions for nonsuit and judgment notwithstanding the verdict (JNOV), and the jury's findings are not supported by substantial evidence. We agree that, as a matter of law, Kenyon was an at-will employee and therefore reverse the order denying the motion for JNOV and the judgment in favor of Kenyon.

FACTUAL AND PROCEDURAL BACKGROUND

ATA and its affiliate, Scientific Drilling International (SDI), have offices in California and Texas. Its founder, Don Van Steenwyk, owned ATA along with his wife, Elizabeth Van Steenwyk. Don Van Steenwyk hired Kenyon in 1983. Kenyon reported to and worked closely with Don Steenwyk for about 25 years.[1]

In May 1986, ATA provided Kenyon a manual which included its termination policy. That policy opened with the following paragraph: "It should be remembered that employment at [ATA] is at the mutual consent of the employee and employer. Consequently, either the employee or the employer can terminate the employment relationship at any time." The termination policy also discussed voluntary and involuntary terminations, including terminations for cause. Kenyon signed a document acknowledging he received the manual and understood he was responsible for becoming familiar with its contents, which described the general personnel policies of ATA which governed his employment. The document also stated that "[s]ince information, policies, and benefits described are necessarily subject to change, I understand and agree that any such changes can be made by [ATA] in its sole and absolute discretion, and that material changes will be made known to employees through the usual channels of communication within a reasonable period of time."

---

[1] Unless otherwise indicated, subsequent references to ATA include its predecessors in interest and its affiliates.

In 1992, Kenyon received an updated manual. He signed a document acknowledging his understanding that an "employee or [ATA] [could] terminate the employment relationship 'at will', with or without cause, at any time." The updated manual restated the termination policy in the same language as the 1986 manual, including the at-will provision.

In mid-2009 Don Van Steenwyk retired. Fred Watson became ATA's President, and Kenyon reported to him. Don Steenwyk passed away in late 2009. Elizabeth Van Steenwyk and her family retained ownership of ATA, which continued to grant Kenyon salary increases, cash awards and bonuses. In 2010, ATA named Kenyon Vice President of Operations of Stoneway Properties, a new division for vineyards and other non-oil field operations. He moved his office to Stoneway's winery.

In July 2011, Fred Watson retired, and Kenyon reported to Elizabeth Van Steenwyk. In September 2011, Elizabeth Van Steenwyk and Kenyon recruited Shari Gundrum to do bookkeeping for Stoneway. Gundrum began working at the winery on September 6. Gundrum reported to Elizabeth Van Steenwyk, but Kenyon supervised her work.

Gundrum had an accounting degree and 15 years' experience in accounting. Her duties required that she communicate with ATA employees in multiple locations. Gundrum became increasingly uncomfortable with the way Kenyon "was micro-managing [her] beyond what [she] felt was normal." Kenyon monitored her, followed her and sometimes blocked her path.

In early November, Gundrum discussed Kenyon's style with a manager in Houston. He arranged for Rob McKee, ATA's sole senior vice president in Paso Robles, to meet with Gundrum. They met on November 7, 2011, and Gundrum discussed Kenyon's micro-management style. She did not complain of any intimidation because she feared retaliation from Kenyon.

On November 9, 2011, Kenyon confronted Gundrum angrily several times. He spoke of her communications with other ATA employees, and his need to stay "in the

loop at all times." Gundrum described the confrontations as stressful and intimidating. Gundrum had an asthma attack at home that night, and could not work the following day. She returned to work on November 11. Kenyon's conduct again upset her. She spoke with Jessica Kollhoff, the general manager of the winery. Gundrum told her how Kenyon hovered around her, blocked her path, followed her, and waited for her outside the women's restroom. Kollhoff notified ATA's human resources personnel.

On Monday, November 14, a human resources representative met with Gundrum, while Kenyon was away. Later that week, Daniel Carter, Vice President and General Counsel of ATA and SDI, met with Gundrum. He also gathered information from other employees, and concluded it was Gundrum's perception that a hostile work environment existed. Carter recommended that management issue a written warning to Kenyon. Elizabeth Van Steenwyk, McKee and the human resources manager agreed.

On November 17, 2011, Carter sent Kenyon a text message suggesting they meet. They exchanged messages and met at a Starbucks coffee shop. Carter gave Kenyon an employee warning notice which includes the following description of his "infraction:" "A hostile work environment claim was alleged against [Kenyon]. . . . Based on conversations with the employee and further inquiry of [McKee, Cook and Kollhoff], it appears that a hostile work environment may indeed exist, if not in fact at least by perception." The notice included a "Plan for Improvement" which requested that Kenyon "refrain from 'hovering' over . . . [and] 'following' employees, and . . . invading the private space of employees." It also stated that further complaints would be immediately investigated, and if the complaint were proven accurate, Kenyon would be disciplined, and "a written warning, suspension, or termination" might result.

Carter's meeting with Kenyon lasted about ten minutes. Before he left, Kenyon told Carter he had not harassed anyone, and that he would submit a written response. That night Elizabeth Van Steenwyk sent Kenyon an email. Her email said she would not be in the office on November 18, she would speak with him on Monday, and

4

he should obtain duplicate copies of his office and desk keys for her, and give all blank company checks in his possession to Gundrum.

On Friday, November 18, 2011, Kenyon called in sick. Later that day, Carter emailed Kenyon, and said that "effective immediately," he was suspended with pay for two weeks, for a "cooling off" period, when Carter would "conclude all facets of [his] investigation." He instructed Kenyon that he must not communicate with winery or ranch employees or visit the winery or ranch during his suspension.

Carter continued gathering information and documentation from other ATA employees. On November 30, 2011, Carter submitted a report describing recent and old complaints about Kenyon's conduct. ATA had not demoted or suspended Kenyon, or issued him a written warning as a result of any incidents described in the report. Carter recommended that Kenyon "be terminated immediately" and "offered the opportunity to resign and provide [ATA] a full release," in exchange for 28 weeks of severance pay. He further recommended that Kenyon should "be discharged for cause" if he did not resign. After speaking with Elizabeth Van Steenwyk, management approved Carter's recommendations and instructed Kenyon to come to its office on December 1, 2011.

Kenyon met with McKee, Carter, and the human resources manager on December 1, and presented written requests for his payroll, personnel, and human resource records. He also offered Carter his written response to the harassment claim. Carter gave Kenyon a termination letter dated December 1, 2011, which was signed by Carter. The letter stated that "[f]ollowing [his] investigation . . . a pattern of subordinate abuse emerged;" and Kenyon was released from "all future work responsibilities" effective December 1. The letter further advised Kenyon he could not visit ATA's winery or ranch locations, including his office, or have contact with winery or ranch employees. The letter enclosed a severance agreement and release. Kenyon never signed it.[2]

---

[2] At the time of his termination, Kenyon's annual salary was $102,816. ATA also paid him benefits and awards. His 2009 and 2010 cash awards were $17,069.47 and $3,709.31, respectively.

5

After ATA terminated his employment, Kenyon filed a complaint against ATA. He alleged claims for breach of an implied contract that his employment would not be terminated without good cause, breach of the implied covenant of good faith and fair dealing, wrongful termination in violation of public policy, age discrimination, and intentional infliction of emotional distress.

ATA filed a motion for summary judgment seeking dismissal of Kenyon's claims. The trial court ruled in its favor as to the non-contract claims. The court rejected ATA's argument that, as a matter of law, Kenyon was an at-will employee. In doing so, the court appeared to believe a jury might find there were "oral representations and conduct or custom" that modified Kenyon's status as an at-will employee. At trial, Kenyon testified about his employment history. He also testified that ATA terminated employees only for cause, and its supervisors and managers disciplined employees with warnings, and suspensions before terminating their employment. There was not, however, any testimony concerning representations or promises made to Kenyon after he signed the 1992 agreement and acknowledgement.

At the conclusion of Kenyon's case in chief, ATA moved for a nonsuit on the ground that, as a matter of law, Kenyon was an at-will employee. The court denied the motion. The jury returned a special verdict and made the following findings: (1) Kenyon was an employee of ATA; (2) Kenyon was not "an at-will employee of ATA such that his employment could be ended, at any time, for any reason, or for no reason at all;" (3) ATA promised, "by words or conduct, not to discharge . . . Kenyon except for good cause;" (4) Kenyon substantially performed his job duties; (5) ATA did not "have good cause to discharge" him, or act in good faith in doing so; (6) Kenyon was harmed by the discharge; and (7) his total economic loss was $500,671. The court denied ATA's subsequent motion for JNOV, and awarded Kenyon $4,752.51 in costs.

## DISCUSSION
### *Kenyon was an At-Will Employee*

ATA contends that, as a matter of law, Kenyon was an at-will employee who could be terminated without cause, and that any evidence purporting to show an

6

implied contract not to terminate except for cause has no legal significance. We agree. Kenyon claims that ATA's conduct and representations modified its at-will relationship with him. The record lacks any evidence that ATA or any of its officers or supervisors suggested that it had modified that relationship.

An employment having no specified term may be terminated at the will of either party. (Lab. Code, § 2922; *Foley v. Interactive Data Corp*. (1988) 47 Cal.3d 654, 678.) The plaintiff has the burden of rebutting the statutory presumption that his employment is at will. (*Haycock v. Hughes Aircraft Co*. (1994) 22 Cal.App.4th 1473, 1489.) The existence of an implied promise to discharge for cause is generally a question of fact for the jury. However, if the facts are undisputed and permit only one conclusion, the issue may be resolved as a matter of law. (*Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1386-1387.)

The trial court's denial of ATA's motions for nonsuit and JNOV were premised on its interpretation of the parties' agreement. The interpretation of an agreement, and the admissibility of evidence concerning the parties' intent, are questions of law. (*Hayter Trucking, Inc. v. Shell Western E & P, Inc*. (1993) 18 Cal.App.4th 1, 14.) When reviewing a JNOV which presents solely a question of law we apply a de novo standard of review. (*Trujillo v. North County Transit Dist*. (1998) 63 Cal.App.4th 280, 284.)

The terms of employment are often promulgated in personnel handbooks, policy manuals, and memoranda disseminated to employees. (*Guz v. Bechtel National, Inc*. (2000) 24 Cal.4th 317, 339 (*Guz*).) At-will provisions in such documents "do not bar, or necessarily overcome, other evidence of the employer's contrary intent." (*Id.* at p. 339.) However, "most cases applying California law . . . have held that an at-will provision in an *express written agreement*, signed by the employee, *cannot* be overcome by proof of an implied contrary understanding." (*Id.* at p. 340, fn. 10.) "[A] clear and unambiguous at-will provision in a written employment contract, signed by the employee, cannot be overcome by evidence of a prior or contemporaneous implied-in-

7

fact contract requiring good cause for termination." (*Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 389.) "[T]he more clear, prominent, complete, consistent, and all-encompassing the disclaimer language set forth in handbooks, policy manuals, and memoranda disseminated to employees, the greater the likelihood that workers could not form any reasonable contrary understanding." (*Guz,* at p. 340, fn. 11.)

Kenyan asserts that manuals and his acknowledgements did not constitute an express at will agreement encompassing grounds for termination. We disagree. "To be enforceable a written agreement need not be entitled 'contract.' 'A contract is an agreement to do or not to do a certain thing' (Civ. Code, § 1549), and the elements of a contract include parties capable of contracting, their mutual consent, a lawful object and sufficient consideration (*id.*, §§ 1550, 1565)." (*Agosta v. Astor* (2004) 120 Cal.App.4th 596, 604-605.) The termination policy, including its at-will provision, was "clear, prominent, complete, consistent, and all-encompassing." (*Guz, supra*, 24.Cal.4th at p. 340, fn. 11.) Kenyan's continued employment after he signed the acknowledgement "constituted [his] acceptance of the . . . employment term" regarding termination. (*Asmus v. Pacific Bell* (2000) 23 Cal.4th 1, 15.)

The trial court concluded it could not rule as a matter of law that Kenyon was an at-will employee. The court based that conclusion in large part on what it described as "some ambiguity in the [ATA manual] concerning cause for termination," and it stressed that the termination policy itself discussed terminations for cause. We do not agree that references to terminations for cause in that policy rendered ATA's at-will provision ambiguous. ATA's termination policy opens with its at-will provision, and reminds employees that "employment at [ATA] is at the mutual consent of the employee and employer," and "either the employee or the employer can terminate the employment relationship at any time." That prominent placement emphasized ATA's right to terminate employees at will. (*Guz, supra*, 24 Cal.4th at p. 341.)

In ruling against ATA, the trial court also cited Kenyon's long-term employment, with salary increases and promotions. Those factors did not limit ATA's

8

right to terminate Kenyon without cause. "[A]n employee's *mere* passage of time in the employer's service, even where marked with tangible indicia that the employer approves the employee's work, cannot *alone* form an implied-in-fact contract that the employee is no longer at will." (*Guz, supra*, 24 Cal.4th at pp. 341-342.) "[S]uch events are but natural consequences of a well-functioning employment relationship, and thus have no special tendency to prove that the employer's at-will implied agreement, reasonably understood as such by the employee, has become one that limits the employer's future termination rights." (*Id*. at p. 341.) Rather, "[t]he issue is whether the employer's words or conduct, on which an employee reasonably relied, gave rise to that *specific* understanding" (*id*. at p. 342) that seniority and longevity of employment created rights against termination at will. Such reliance was not reasonable in Kenyon's case. He demonstrated his acceptance of the ATA's right to terminate his employment at will by continuing to work there after acknowledging that ATA could terminate his employment relationship "with or without cause, at any time." (*Asmus v. Pacific Bell, supra,* 23 Cal.4th at p. 15.)

At trial, Kenyon testified that ATA followed a practice of terminating employees only for cause. Even assuming that is true, it merely reflects good employer practice, not ATA's intent to limit its power to terminate at will. "Otherwise, an employer would be forced purposely to terminate employees for any and every infraction-or none at all-in order to maintain the presumption of at-will employment. The law does not require such caprice to avoid creating an implied in fact contract." (*Davis v. Consolidated Freightways* (1994) 29 Cal.App.4th 354, 366.)

Because the at-will provision allowing ATA to terminate Kenyon's employment without cause was in effect at the time of his termination, his contract action, based upon an implied in fact contrary agreement, fails as a matter of law. The trial court therefore erred by denying ATA's motions for nonsuit and JNOV. Having reached that conclusion, we need not address ATA's claim that the jury's findings are not supported by substantial evidence.

9

DISPOSITION

The order denying the JNOV and judgment in favor of Kenyon are reversed, and the trial court is directed to instead enter judgment in favor of ATA. Each party shall bear its own costs.

<u>NOT TO BE PUBLISHED.</u>

PERREN, J

We concur:

GILBERT, P.J.

YEGAN, J.

10

Jac A. Crawford, Judge

Superior Court County of San Luis Obispo

_____

Kinman & Curry, Barry Alan Kinman and Marilyn P. Curry, for Plaintiff and Respondent.

Gordon & Rees, Don Willenburg; Gordon & Rees, Mollie Burks-Thomas and Marc A. Holmquist, for Defendant and Appellant.